Stephen ADAMS, Alfred T. Burke, and
Merritt Gates, Plaintiffs,

v.

BOARD OF GOVERNORS OF the
FEDERAL RESERVE BOARD,
Defendant.

Civ. No. 4–83–995.

United States District Court,
D. Minnesota,
Fourth Division.

May 14, 1987.

Richard T. Ostlund and Mary E. Curtin, Lindquist & Vennum, Minneapolis, Minn., for plaintiffs.

Jerome G. Arnold, U.S. Atty., and Elissa G. Mautner, Asst. U.S. Atty., Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiffs' objections to the January 15, 1987 report and recommendation of the United States Magistrate. The Magistrate recommended that defendant's motion for summary judgment be granted and plaintiffs' cross-motion for summary judgment be denied. The Court will adopt the Magistrate's report and recommendation.

## FACTS

Plaintiffs Adams, Burke and Gates instituted this action, seeking damages and attorneys' fees arising from alleged violations of the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401 *et seq.* Plaintiffs allege that defendant obtained financial information concerning loans made by the American National Bank (ANB) to the plaintiffs from ANB and the Office of the Comptroller of Currency (OCC) without complying with the procedural requirements of the RFPA. The information obtained by defendant from ANB and OCC was used in an administrative proceeding against Stephen Adams. Plaintiffs are all residents of Minnesota.

This case arises from a series of events which began on March 28, 1980. On that date, plaintiff Adams filed a notice of intent to acquire the Bank of Montana Systems (BMS). The notice of intent was filed with the Federal Reserve Board (FRB) pursuant to the Change in Bank Control Act, 12 U.S.C. §§ 1817(j)(6)(A–F). Adams proposed to acquire 19.5 percent of the voting stock of BMS, which is a bank holding company consisting of fifteen subsidiary banks. In the notice of intent, Adams and various organizations[1] with which he is associated proposed to acquire this 19.5 percent "controlling interest" under the Control Act for a purchase price of $4.7 million, of which $4 million was to be debt financed. The notice stated that the financing for the acquisition of BMS stock was to come primarily from ANB. ANB is a member bank of the Federal Reserve System as defined in 12 U.S.C. § 221. ANB's deposits are insured under the provisions of the Federal Deposit Insurance Act as well, 12 U.S.C. § 1813(h).

After the notice of intent to acquire the 19.5 percent voting stock of BMS was filed, Adams informed the FRB that he intended to acquire additional BMS stock, increasing Adams holdings to 44 percent of the outstanding BMS voting stock. This additional stock purchase was to be entirely financed by debt in the form of loans from ANB.

Under the Change in Bank Control Act potential acquisitions of control of bank holding companies such as BMS may be disapproved by the FRB. 12 U.S.C. § 1817(j)(1). The FRB was primarily concerned about Adams' proposed acquisition because of the amount of debt financing involved.[2] The FRB therefore notified Adams in a letter dated June 11, 1980 that it had serious concerns about how Adams would be able to service the debt resulting from the proposed transaction without causing harm to or prejudicing the financial stability of BMS. Adams responded by letter the same day and submitted cash flow projections for Adams himself and the various companies involved (hereinafter referred to as the "Adams Group"). Included in the letter were twelve-year projec-

---

1. The Control Act notice listed Adams; Associated Bankers Corp.; Burke Beverage Co.; First National Inc. of Springfield, Colorado; and Waite and Company, Inc. of Bozeman as "acquiring parties." Additionally, the notice stated that these parties had options on additional shares which would give them twenty-eight percent of the total BMS outstanding shares.

2. Originally the FRB was concerned about issues of bank competition in two Montana markets which might result from the BMS acquisition, and notified Adams of this concern by letter dated May 16, 1980. This concern subsequently became moot by Adams' divestiture of certain of the Montana banks involved.

tions from the Adams Group's debt servicing requirements resulting from the BMS acquisition and a description of an asset liquidation program designed by Adams to generate additional revenues to service the BMS acquisition debt.

Before the FRB responded to Adams' letter of June 11, 1980, Adams went ahead and completed an agreement on July 1, 1980 to purchase 58,331 shares of BMS stock from the James J. Brown family (Brown stock). Additionally, Adams completed an agreement on July 10, 1980 to purchase 50,928 shares of BMS stock from Joanne Rubie (Rubie stock). Both agreements were contingent upon the FRB's approval of Adams' Change in Control Act notice and upon the closing of Adams' other BMS stock purchases. Shortly after the completion of these agreements, the FRB notified Adams that in all probability his proposed BMS acquisitions would be disapproved on financial grounds. On July 22, 1980 Adams and his attorney met with James Deusterhoff of the Federal Reserve Bank of Minneapolis, John Ryan, Director of the FRB's Division of Banking Supervision and Regulation, and other FRB staff to discuss the situation. At this meeting Adams agreed to submit additional documentation with regard to the financing of the BMS acquisition. Adams also informed the FRB at this meeting that he intended to take effective control of BMS and that including the Brown and Rubie stock, his total acquisitions of BMS common stock would amount to 44 to 46 percent of BMS outstanding stock. Adams confirmed this additional stock acquisition in a July 31, 1980 letter to the FRB. On the same date Adams submitted an amended Change in Control Act notice seeking approval of his acquisition of approximately 44 percent of BMS' outstanding stock.

On August 12, 1980, the Federal Reserve Bank of Minneapolis submitted an amended analysis of Adams' amended notice to the FRB, recommending that Adams' proposed acquisition of 44 percent of BMS' outstanding stock be disapproved on financial grounds. The Reserve Bank's law department noted that it considered the primary issue posed by Adams' proposal to be Adams' financial condition, and cited 12 U.S.C. § 1817(j)(7)(C), which provides that the Federal Reserve System may disapprove a proposed acquisition if:

> the financial condition of any acquiring person is such as might jeopardize the financial stability of the bank or prejudice the interests of the depositors of the bank.

The law department stated that its recommendation was based on its opinion that Adams' financial condition was insufficient to assure servicing of the additional debt resulting from Adams' amended proposal to acquire 44 percent of BMS' stock. The law department further noted that the proposed acquisition would give Adams control of BMS under Regulation Y of the Board of Governors of the FRB, 12 C.F.R. § 225.-2, which defines control as the ownership, control or power to vote more than twenty-five percent of outstanding stock. The law department noted that this control would enable Adams to influence the affairs of BMS, and therefore the proposed acquisition created a considerable likelihood that BMS or Adams' other banking interests could be adversely affected.

The Board of Governors was scheduled to consider Adams' Control Act notice on August 22, 1980. However, Adams met with John Ryan, Director of the Board's Division of Banking Supervision and regulation on August 21, 1980 and agreed to extend the processing period of his notice and to revise his proposed ownership percentage downward. A series of negotiations between Adams and the Federal Reserve Bank of Minneapolis ensued. In a letter from Adams' attorney dated September 24, 1980, Adams agreed not to purchase either the Brown or Rubie stock and to limit the percent of BMS stock acquired to 27.98 percent. The final proposal from Adams was for acquisition of 205,043 shares of BMS common stock at a total purchase price of $6,963,431.50, of which 78.9 percent or $5,496,252 was to be debt financed. As part of the final proposal, Adams agreed to sign a commitment designed to alleviate the FRB's concern over any financial pressure Adams might feel to

extract funds from BMS in the form of excessive dividends, management fees, etc., to service debt resulting from any future purchases of BMS stock by Adams over the 27.98 percent of stock proposed to be acquired in the final amended notice. The commitment, which was signed by Adams on October 8, 1980, stated that Adams agreed to maintain certain gross capital to total assets ratios for BMS and other Adams-controlled banks, and further stated that

> I [Adams], my spouse, dependent children and/or any entity in which we have, in the aggregate, a 10 per cent interest, shall not directly or indirectly acquire, in the aggregate, 5 per cent or more of the outstanding voting stock of Bank of Montana System or any interest convertible into voting stock of Bank of Montana System in any given 12 month period without the prior approval of the Federal Reserve System.

On October 15, 1980, the FRB issued its decision not to disapprove Adams' proposed acquisition of 27.98 percent of BMS stock, stating that it was relying specifically on Adams' commitment to maintain certain gross capital to total assets ratios and to limit his further BMS stock purchases as described in the October 8, 1980 commitment letter.

On October 16, 1980 Adams renewed negotiations with Joanne Rubie to purchase her shares of BMS stock. Adams instructed his attorney to draw up the purchase agreements to conform with his FRB commitment. On February 11, 1981, Adams and Rubie entered into four purchase agreements whereby Adams committed to purchase 10,000 shares of Rubie stock on February 20, 1980; 9,550 shares on February 20, 1983; 18,189 shares on February 20, 1984; and 13,189 shares on February 20, 1985. These agreements were subject to the condition precedent that no judicial or administrative body issue an order making it impossible or inadvisable for Adams to consummate the transaction. Rubie was aware of the commitment Adams had already made with the FRB. The February 11, 1981 agreements were substantially identical to the single agreement proposed

by Adams back on July 10, 1980, except that (1) title to the shares would not pass to Adams until the specified purchase dates; (2) all dividends on all 50,928 Rubie stock shares after the first quarterly dividend of 1982 were to go to Adams; and (3) the effective date of interest during the first two years of the agreements was changed, resulting in a reduction of $47,246 in interest due on the purchase of the 50,928 Rubie stock shares.

Adams also instructed his attorney to draw up purchase agreements for the Brown stock which conformed to the commitment Adams had made with the FRB. On January 27, 1981 Adams executed eleven contracts for purchase of the Brown stock over a ten-year period. Brown was also aware of the FRB commitment and a provision of the contract was that Adams would incur no obligations in violation or contravention of restrictions or prohibitions imposed by the FRB or other government agencies. Additionally, the contracts limited the right of specific performance to the extent that the party so performing could do so lawfully. The contracts for purchase of the Brown stock provided that Adams would take title to, and incur direct and unconditional financial obligation for the principal payments of, specific numbers of shares only upon maturation of each successive contract. However, the contracts also provided that Brown would execute voting proxies for all shares involved immediately in 1981 for Adams' benefit. Additionally, Adams assumed an unconditional obligation to make annual payments beginning in January, 1984 of an interest charge on the declining principal balance on the remaining unacquired shares. Adams was given the right to receive dividends on all the shares after 1983, and as of 1981 became the "beneficial owner" of all shares for the purpose of filing requirements of section 13(d) of the Securities Exchange Act of 1934.

Adams' acquisition of the Brown and Rubie stock was discovered by the Federal Reserve Bank during a routine inspection of BMS in June, 1981. At that time the Reserve Bank examiners found a proxy

statement dated May 8, 1981 which had been distributed to BMS stockholders for a June 17, 1981 annual shareholders meeting. The proxy statement indicated that from October, 1980 through April, 1981, Adams, the Adams Group corporations, Alfred T. Burke, Merrit Gates, and Wayne Boysen had either purchased or entered into agreements to purchase an aggregate of 329,574 shares of BMS and an aggregate of $399,-000 in principal amount of subordinated debentures. The proxy statement also noted the Brown and Rubie stock transactions.

Burke, Gates and Boysen are all personal and/or business associates of Adams. Burke, Gates and Boysen all purchased their BMS stock through ANB loans, some of which were guaranteed by Adams. All three became involved in BMS stock purchases as a result of discussions with Adams. Additionally, all three utilized the services of Universal Monetary Corporation (UMC) for short-term financing of their BMS stock purchases. UMC was created and operates to service the business interests of Adams and his business partners. Burke, Boysen and Gates had all used UMC in the past to obtain short-term financing on investments which Adams was involved in. Boysen and Gates both utilized the services of Thomas Zorr, Adams' accountant, in arranging ANB-financed purchases of BMS stock as well. A series of ANB–BMS transactions occurred which resulted in ANB extending a $1.8 million credit line to Gates, Burke and Boysen for purchases of BMS stock. As a result, the three men obtained a substantial minority interest in BMS. ANB requested that Adams, Burke, Boysen and Gates enter into a series of buy-sell agreements to cover the BMS stock purchases and tie Burke, Boysen and Gates' interest to Adams' interest, giving these men working control of BMS. The terms of the resulting agreement allowed Adams to "call," at a fixed price and at his option, the BMS shares owned by Burke, Boysen and Gates, and would also allow ANB, Burke, Boysen or Gates to "put" their shares to Adams, mak-

ing him a potential obligor on any existing BMS stock debts of Burke, Boysen or Gates. ANB was satisfied, however, that Burke, Boysen and Gates had the financial resources to meet the payments on their loans.[3]

Thomas Zorr, Adams' accountant, acquired 400 shares of BMS stock in 1981. Then, in the spring of 1982, Zorr purchased 2,047 shares of BMS stock from Adams' mother. Zorr financed this purchase by utilizing an unused portion of a loan to Adams from ANB. The 2,047 shares were pledged back to ANB as collateral, and Adams and Zorr entered into a buy-sell agreement with "put" and "call" provisions similar to those executed by Adams, Burke, Boysen and Gates.

Ostensibly because Burke, Boysen and Gates traveled often, these three men gave voting proxies to Adams to vote all shares registered in their names at the 1981 and 1982 annual meetings of BMS shareholders.

Then, at a special meeting of BMS' board of directors in November, 1980, Adams and Gates were elected to two newly-created positions on the Board. Adams intended to persuade the Board to act consistently with his banking philosophy and practice. At the time however, the Board was still dominated by Charles W. Rubie, president and chief executive officer of BMS, who opposed Adams' plans for BMS. Throughout 1981, Adams, the Adams Group companies, Burke, Boysen and Gates acquired beneficial ownership (as defined by section 13(d) of the Securities Exchange Act of 1934) of over fifty percent of BMS stock. Only Adams and Burke were on the board of directors however, and they continued to have disagreements with the rest of the board over the amount of dividends to be paid on common stock, the retention of the then-present management of BMS, and the decentralization of management of BMS' subsidiary banks.

**3.** Financial statements provided to ANB showed the net worths of Burke, Boysen and Gates to be $8 million, $1 million and $250,000 respectively.

In September, 1981 Adams demanded a special shareholders meeting to increase the size of the board of directors. The board rejected Adams' demand for a special meeting and then amended the BMS by-laws to require a two-thirds vote of the shareholders to change the size of the board. Adams also unsuccessfully asked Charles Rubie to resign. Then, in December, 1981, Adams discovered that Charles Rubie was attempting to borrow $2.2 million from BMS to pay off some ANB loans. Adams believed that Charles Rubie was near bankruptcy at the time, and in January, 1982 Adams sued Rubie and the other board members over the loans to Rubie, the purchase of a state bank for BMS stock aimed at diluting Adams' interest percentage in BMS, and the amendment of the by-laws requiring a two-thirds vote of shareholders to change the size of the board of directors. In April, 1982 the case was settled with the agreement that (1) the board of directors would be reduced to seven, but four of the directors would be selected by Adams to run for election; (2) Charles Rubie resigned from BMS but entered into a consultant relationship with the company; and (3) Adams would not vote shares beneficially held by him in favor of certain corporate transactions.

Prior to this settlement, on March 2, 1981, attorneys for BMS filed a petition with the FRB alleging that Adams had violated the Change in Control Act and his commitment to the FRB, and sought an investigation and appropriate supervisory action.

In a wholly-unrelated occurrence, the Office of Comptroller of Currency (OCC) conducted its regularly scheduled examination of ANB in May and June of 1982. Pursuant to 12 U.S.C. § 1, OCC has the duty to execute all laws relating to issuance and regulation of currency and supervision of national banks. Part of OCC's examination involves assessing the credit worthiness of loans made by the bank. Thus, as part of its examination, OCC inspected ANB's files pertaining to loans made by ANB to Adams and the Adams Group. The OCC examiners, who are appointed by the OCC under the authority of the FRB to conduct such examination pursuant to 12 U.S.C. § 481, notified the FRB that portions of the Adams/Adams Group loans would become classified, *i.e.*, be officially designated as risky loans. OCC examiners also notified the FRB that Adams had assumed financial obligations in regard to ANB loans to Boysen, Burke and Gates' acquisition of BMS stock by pledging certain assets to secure the loans. The OCC also told the FRB that ANB considered the loans as interrelated credits. The OCC provided the FRB with OCC's work papers regarding ANB's loans to Adams for the BMS acquisition, and notified the FRB that certain of the Adams' loans were to be classified substandard, *i.e.*, credit risks.

Additionally, in June, 1982 the Federal Reserve Bank conducted its annual inspection of BMS, reviewing SEC documents and other BMS records. Based on this review and the OCC's inspection report, the FRB concluded that Adams had violated the Control Act and the Adams-FRB commitment. On August 10, 1982 FRB decided to investigate to confirm information and documents obtained from ANB. On August 12, 1982 FRB and OCC examiners went to ANB and requested files dealing with loans to Adams and the Adams Group corporations relating to purchases of BMS stock. ANB complied, allowing the examiners to review the documents and copy some of them. Soon thereafter, the FRB drafted a notice of changes alleging that Adams had violated both the Change in Control Act and his commitment to FRB. Negotiations between the FRB and Adams continued between October, 1982 and June, 1983 without success. On June 22, 1983 the FRB initiated a formal administrative enforcement proceeding against Adams.

On August 3, 1983, with the proceeding pending, FRB examiners went to ANB again to review loan files dealing with BMS stock acquisition. No documents were taken or copied, although the ALJ in charge of the administrative proceedings had issued subpoenas to obtain the documents.

This rather long and involved set of facts led to the issue presently before the Court, which involves the fact that neither Adams,

Burke, Gates nor Boysen were given any notice prior to, during, or after any of the three reviews by the OCC (in June, 1982) and the FRB (on August 12, 1982 and on August 3, 1983) of their loan records dealing with BMS stock acquisitions. Plaintiffs allege that this lack of notice violates the RFPA.

Both plaintiffs and defendant filed cross-motions for summary judgment in this case. Oral argument was held by former Chief Judge Miles Lord, who retired before any decision was issued. The case was reassigned to this Court, which referred the summary judgment motions to the United States Magistrate. On January 15, 1987, the Magistrate issued a report and recommendation recommending that defendant's motion for summary judgment be granted and that plaintiffs' motion for summary judgment be denied. Plaintiffs have filed objections to the Magistrate's report and recommendation. The parties agree that there are no material issues of disputed fact involved, and that the issue before the Court involves only a question of the interpretation and applicability of various provisions of the RFPA. Since the only issue before the Court is a legal one, the Magistrate's recommendation will be reviewed de novo.

## DISCUSSION

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.,* 741 F.2d 1142, 1144–45 (8th Cir.1984). The non-moving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City,* 751 F.2d 288, 289 (8th Cir.1984).

The essential question in this case is whether or not the FRB is exempt from the notice requirements of the RFPA.

The RFPA is contained in Title XI of the Financial Institutions Regulatory and Interest Rate Control Act of 1978. One of the primary legislative purposes of this Act was "to strengthen the supervisory authority of Federal agencies which regulate depository institutions ... to control the sale of insured financial institutions...." H.R. Rep. No. 1383, 95th Cong., 2d Sess. 7, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9273–74. Congress passed this Act to deal with the need to reform and restructure the national regulatory process in light of the rising number of bank failures and problems in the banking industry generally. *Id.* 9279.

> The purpose of Title XI, the RFPA, is to protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity. Therefore, the title seeks to strike a balance between customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations.

H.R.Rep. No. 1383, 95th Cong., 2d Sess. 33, *reprinted in* 1978 U.S.Code Cong. & Admin.News 9305. The RFPA strikes this balance between the customer's right to privacy and legitimate law enforcement needs by providing that the government cannot gain access to a bank customer's financial records or other information without first complying with the notice and procedure requirements of the RFPA. The RFPA requires that the government agency seeking customer financial information must first reasonably describe the records sought and then obtain either:

(1) customer authorization;

(2) administrative subpoena or summons;

(3) search warrant;

(4) judicial subpoena; or

(5) formal written request by the government authority pursuant to 12 U.S.C. § 3408.

*See,* 12 U.S.C. §§ 3402(1)–(5), 3404, 3405, 3407, 3408 and 3412.

Moreover, under 12 U.S.C. § 3403, a financial institution is prohibited from releasing customer information to a government authority unless the provisions of the RFPA have been complied with first:

a financial institution shall not release the financial records of a customer until the Government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of this chapter.

12 U.S.C. § 3403(b).

The RFPA contains ten exceptions to the notice and procedure requirements listed in 12 U.S.C. § 3402(1–5). These exceptions taken from 12 U.S.C. § 3413(a)-(j), apply to the following situations:

(a) disclosure of financial records not identified with particular customers;

(b) disclosure pursuant to exercise of supervisory, regulatory, or monetary functions of financial institutions;

(c) disclosure pursuant to the Internal Revenue Code;

(d) disclosure pursuant to Federal statute or rule promulgated thereunder;

(e) disclosure pursuant to Federal Rules of Civil or Criminal Procedure or comparable rules of other courts;

(f) disclosure pursuant to administrative subpoena issue by an administrative law judge;

(g) disclosure pursuant to legitimate law enforcement inquiry respecting name, address, account number and type of account of particular customers;

(h) disclosure pursuant to lawful proceeding, investigation, etc. directed at financial institution or legal entity or for consideration or administration respecting Government loans, loan guarantees, etc.;

(i) disclosure pursuant to issuance of subpoena or court order regarding grand jury proceedings;

(j) disclosure pursuant to proceeding, investigation, etc. instituted by the General Accounting Office and directed at a government authority.

In the case at bar, it is undisputed that the FRB did not comply with the requirements of the RFPA when it obtained access to plaintiffs' customer BMS loan records from the OCC or the ANB. However, defendant alleges that it was exempt from the notice and procedure requirements of the RFPA because two of the section 3413 exemptions apply in this case. These two exemptions are:

A. the exemption for supervisory agencies, 12 U.S.C. § 3413(b); and

B. the exemption for information required to be reported by law, 12 U.S.C. § 3413(d).

Plaintiffs argue that these exemptions do not apply.

**A. The Exemption for Supervisory Agencies**

 The supervisory agency exemption to the RFPA states:

Nothing in this chapter prohibits examination by or disclosure to any supervisory agency of financial records or information in the exercise of its supervisory, regulatory, or monetary functions with respect to a financial institution.

12 U.S.C. § 3413(b). Essentially this exemption applies where a customer's financial records are disclosed by a financial institution to a supervisory government agency which is exercising a specified function vis-a-vis the financial institution.

"[S]upervisory agency" means, with respect to any particular financial institution any of the following which has statutory authority to examine the financial condition or business operations of that institution—

. . . .

(E) the Board of Governors of the Federal Reserve System;

(F) the Comptroller of the Currency. . . .

12 U.S.C. § 3401. Thus defendant in this case is clearly a supervisory agency for purposes of the supervisory agency exemption.

Plaintiffs argue, however, that the FRB was not operating in the exercise of its supervisory, regulatory, or monetary functions when it accessed plaintiffs' financial records. Plaintiffs contend the FRB was not examining the financial condition of the institution, but was instead examining the financial condition of the individual plaintiffs. As the Magistrate stated in the report and recommendation:

> The cornerstone of plaintiffs' argument is that the Section 3413(b) exception only allows a supervisory agency to "examine the financial condition or business operation of an institution, not an individual." Plaintiff argues that the FRB obtained information to investigate plaintiff as an individual. Because FRB is not a supervisory agency with respect to individuals, plaintiffs argue, the supervisory agency exception does not apply here.

Report and Recommendation at 8.

Defendant's view is diametrically opposite to plaintiffs' view. Defendant argues that the supervisory agency exception was intended precisely for this situation. Defendant contends that the FRB, in exercising its examination authority over BMS and ANB, may in the ordinary course of its business, obtain individual customer records without complying with the notice and procedure requirements of the RFPA. Defendant claims that this is a necessary incident of its statutorily authorized control over banks, and is required to properly effectuate its congressional charge. *Id.*

Therefore, it is necessary to examine the scope of defendant's statutory examination powers to determine if its accessing of plaintiffs' financial records was within defendant's legitimate exercise of supervisory power and therefore covered by the "supervisory agency" exemption to the RFPA.

■ Under the Change in Bank Control Act, Title VI of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, defendant FRB is designated as the federal agency empowered to review and disapprove applications for change in control of insured banks and bank holding companies such as ANB and BMS. 12 U.S.C. §§ 1817(j)(1); 1841. Such disapproval may be made if the FRB determines that such a change is prejudicial to the bank or financially dangerous to the bank's depositors. 12 U.S.C. § 1817(j)(7)(C). Therefore, any person planning to acquire a bank or bank holding company (such as BMS) must submit, as plaintiff Adams did, a notice of intent to acquire pursuant to 12 U.S.C. § 1817(j). Any insured bank (such as ANB) which makes a loan to a person for acquiring control of a bank or bank holding company must report such a transaction to the FRB. 12 U.S.C. § 1817(j)(9). Moreover, under the Holding Companies Act, Title XIII of the Financial Institutions Regulatory and Interest Rate Control Act of 1978, the FRB is authorized to require reports informing it as to whether the provisions of the Control Act are being complied with, and to this end may examine each bank holding company and subsidiary thereof. 12 U.S.C. § 1844(c). Thus, in the specific context of this case, defendant clearly had supervisory and regulatory power to gather and examine records pertaining to Adams' acquisition of BMS and his use of ANB loans to finance that acquisition.

Additionally, the FRB has general supervisory statutory authority to examine the financial operations and condition of member banks. The Federal Reserve Act gives the FRB the power to:

> (1) examine at its discretion the accounts, books and affairs of each federal reserve bank and of each member bank;
>
> (2) subject member banks to examination at the direction of the Board; and
>
> (3) provide for special examination of member banks.

*See,* 12 U.S.C. §§ 248(a), 325 and 483. ANB and many of BMS's fifteen subsidiary banks are member banks subject to these examinations by the FRB. The purpose of these general supervisory examinations is obvious—to ensure the financial health and stability of member banks. Defendant has

broad supervisory authority to examine, at its discretion, the accounts, books and affairs" of member bank ANB. ANB's loan portfolio, and the individual loans contained therein, are clearly "accounts, books and affairs" of ANB. Moreover, the strength of ANB's loan portfolio is an essential part of ANB's overall financial strength. Therefore, defendant was acting within the scope of its general statutory supervisory authority vis-a-vis ANB when it obtained access to ANB records of ANB loans made to plaintiffs. *See* 12 U.S.C. §§ 248(a), 325 and 483. As the Magistrate stated:

It would be incongruous to assume Congress would specifically formulate and pass a supervisory agency exception which specifically allows access to customer financial records and then define supervisory agency in such a way that obtaining access to individual customer records is barred.

Report and Recommendation at 19.

Defendant was a supervisory agency exercising its supervisory and regulatory functions when it obtained access to the records in question in this case. Therefore, defendant was exempt from the notice and procedure requirements of the RFPA under the supervisory agency exemption, 12 U.S.C. § 3413(b).

**B. The Exemption for Information Required to be Reported by Law**

The required to be reported exemption to the RFPA states:

Nothing in this chapter shall authorize the withholding of financial records or information required to be reported in accordance with any Federal statute or rule promulgated thereunder.

12 U.S.C. § 3413(d). Under this exemption, defendant is exempt from the notice and procedure requirements of the RFPA if it accessed records which were already subject to disclosure to defendant pursuant to a federal statute or rule promulgated thereunder.

Plaintiffs argue first that Burke and Gates had no legal duty to report their ANB-loan financed BMS acquisitions, and that Adams' legal duty to report his ANB-loan financed BMS acquisitions ended when defendant issued its October, 1980 notice of intent not to disapprove. Plaintiffs further argue that the information defendant got from ANB went beyond any information statutorily required to be reported to defendant.

The Change in Control Act, specifically 12 U.S.C. § 1817, sets out the statutory reporting requirements at issue in this case. There are reporting requirements on any "... person, acting directly or indirectly or through or in concert with one or more other persons [to] acquire control of any insured bank ... [or bank holding company]." 12 U.S.C. § 1817(j)(1). There are also reporting requirements on the president or CEO of an insured bank "[w]henever [such a] bank makes a loan or loans, secured, or to be secured, by 25 per centum or more of the outstanding voting stock of an insured bank [or bank holding company].…" 12 U.S.C. § 1817(j)(9). The information required to be reported in both cases is the same. 12 U.S.C. § 1817(j)(9). The statutorily required-to-be-reported information is as follows:

Except as otherwise provided by regulation of the appropriate Federal banking agency, a notice filed pursuant to this subsection shall contain the following information:

(A) The identity, personal history, business background and experience of each person by whom or on whose behalf the acquisition is to be made, including his material business activities and affiliations during the past five years, and a description of any material pending legal or administrative proceedings in which he is a party and any criminal indictment or conviction of such person by a State or Federal court.

(B) A statement of the assets and liabilities of each person by whom or on whose behalf the acquisition is to be made, as of the end of the fiscal year for each of the five fiscal years immediately preceding the date of the notice, together with related statements of income and source and application of funds for each of the fiscal years then concluded, all

prepared in accordance with generally accepted accounting principles consistently applied, and an interim statement of the assets and liabilities for each such person, together with related statements of income and source and application of funds, as of a date not more than ninety days prior to the date of the filing of the notice.

(C) The terms and conditions of the proposed acquisition and the manner in which the acquisition is to be made.

(D) The identity, source and amount of the funds or other consideration used or to be used in making the acquisition, and if any part of these funds or other consideration has been or is to be borrowed or otherwise obtained for the purpose of making the acquisition, a description of the transaction, the names of the parties, and any arrangements, agreements, or understandings with such persons.

(E) Any plans or proposals which any acquiring party making the acquisition may have to liquidate the bank, to sell its assets or merge it with any company or to make any other major change in its business or corporate structure or management.

(F) The identification of any person employed, retained, or to be compensated by the acquiring party, or by any person on his behalf, to make solicitations or recommendations to stockholders for the purpose of assisting in the acquisition, and a brief description of the terms of such employment, retainer, or arrangement for compensation.

(G) Copies of all invitations or tenders or advertisements making a tender offer to stockholders for purchase of their stock to be used in connection with the proposed acquisition.

(H) Any additional relevant information in such form as the appropriate Federal banking agency may require by regulation or by specific request in connection with any particular notice.

12 U.S.C. § 1817(j)(6)(A)-(H).

The defendant in this case obtained ANB loan records and information pertaining to ANB loans made to plaintiffs for acquisition of BMS. Therefore, for purposes of the required to be reported exemption, the question is not whether plaintiffs were required to report information, but whether ANB was. If the ANB records contained information ANB was required to report to defendant, the required to be reported exemption applies.

■ ANB, an insured bank, made loans to plaintiffs that were secured by more than 25 percent of the outstanding stock of BMS, a bank holding company. Thus under the Control Act, a federal statute, these loans were required to be reported by ANB to defendant, along with reports of any arrangements, agreements or understandings ANB had with plaintiffs. 12 U.S.C. §§ 1817(j)(6)(B); 1817(j)(9); 1817(j)(10). In fact, this was the extent of the information defendant accessed from ANB. Additionally, defendant had the statutory authority to specifically request any other information relevant to the stock secured loans. 12 U.S.C. §§ 1817(j)(6)(H) and (j)(10).

Moreover, there is no statutory time limit in which defendant must request information from the bank. ANB had a continuing duty to report stock acquisitions financed by ANB loans which were secured by 25 percent or more of BMS stock, even after the defendant approved the initial acquisition of BMS stock by plaintiff Adams. *Compare,* 12 U.S.C. §§ 1817(j)(9) and (10) *with* 12 U.S.C. §§ 1817(j)(1) and (7).

Defendant accessed ANB records and information which ANB was already required to report under a federal statute, the Change in Control Act, to defendant. Therefore, defendant was exempt from the notice and procedure requirements of the RFPA under the required to be reported by law exemption, 12 U.S.C. § 3413(d).

The Court notes that plaintiffs continue to rely on *Hunt v. Securities & Exchange Commission,* 520 F.Supp. 580 (N.D.Tex. 1981). This reliance is unjustified. In *Hunt* the court held that the plaintiffs were entitled to an injunction against the SEC under the RFPA where the SEC's violations of the notice provisions of the Act were clear and convincing. The issues

in *Hunt* were whether customers were entitled to a complete copy of administrative subpoenas issued pursuant to the RFPA, and whether follow-up oral requests for information outside the scope of an outstanding administrative subpoena required that additional notice be given to customers. Report and Recommendation at 9. As the Magistrate stated:

> Plaintiffs' reliance on *Hunt* is misplaced for several reasons. First, it is the activities of the SEC, not the FRB in question in *Hunt*. Second, the issue in *Hunt* is whether the administrative subpoena employed by the SEC satisfied the notice requirement of the RFPA. On the other hand, the issue here is whether the FRB is wholly exempted from compliance with the notice provisions of the Act. And third, *Hunt* does not discuss the application of either the "supervisory agency exception" or the "required to be reported exception" at issue herein. For these reasons, *Hunt* is not pertinent to this case. Neither plaintiffs nor defendant has cited, nor has the court found, any other case construing the RFPA which bear on the issues present here.

*Id.*

In sum, the Court finds that defendant was clearly exempt from the notice and procedure requirements of the RFPA when it obtained access to ANB records of ANB loans made to plaintiffs for acquisitions of BMS stock.

Based on the foregoing, and upon a de novo review of the report and recommendation of the Magistrate, and upon review of all the files and records in this case,

IT IS ORDERED that

1. plaintiffs' objections to the report and recommendation are overruled;

2. the report and recommendation is adopted;

3. defendant's motion for summary judgment is granted; and

4. plaintiffs' motion for summary judgment is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.