Stephen **ADAMS**, Alfred T. Burke and Merritt Gates, Appellants,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE BOARD, Appellee.**

No. 87–5311.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1988.

Decided Aug. 31, 1988.

James P. McCarthy, Minneapolis, Minn., for appellants.

James A. Michaels, Washington, D.C., for appellee.

---

* The HONORABLE EDWARD DUMBAULD, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation.

Before JOHN R. GIBSON and BEAM, Circuit Judges, and DUMBAULD,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

The issue in this case is whether the Board of Governors of the Federal Reserve System was subject to the procedural requirements of the Right to Financial Privacy Act, 12 U.S.C. §§ 3401–3422 (1982), when it reviewed financial records of Stephen Adams, Alfred T. Burke and Merritt Gates maintained by American National Bank of St. Paul, Minnesota, on three occasions in 1982 and 1983. These records related to loans made by American National to these individuals for purchases of voting stock in Bank of Montana Systems, a bank holding company. Through these purchases, Adams ultimately obtained control over Montana Systems. The district court [1] granted summary judgment and ruled that the Board was exempt from the Financial Privacy Act because it had reviewed the records in the exercise of its supervisory functions with respect to American National and Montana Systems, *see* 12 U.S.C. § 3413(b), and because American National was required to report the information under the Change in Bank Control Act, 12 U.S.C. § 1817(j) (1982). *See* 12 U.S.C. § 3413(d). *Adams v. Board of Governors of the Fed. Reserve Sys.*, 659 F.Supp. 948 (D.Minn.1987). On appeal Adams, Burke and Gates argue that the Board examined the records for the purpose of investigating Adams personally, and that this renders the supervisory agency exception of section 3413(b) inapplicable. They also argue that section 3413(d) applies only to withholding of records or information, and that American National fully complied with the reporting requirements of the Change in Control Act. We affirm the judgment entered by the district court.

As this is an appeal from summary judgment, we state the facts on the basis of the depositions, affidavits and other documents in the record before the district court in the

---

1. The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

light most favorable to Adams, Burke and Gates, giving them the benefit of all inferences which may reasonably be drawn from the facts. *See Mandel v. United States*, 719 F.2d 963, 965 (8th Cir.1983). The parties agreed before the district court that resolution of this case requires only interpretation of the Financial Privacy Act, and that there are no material issues of disputed fact. *Adams*, 659 F.Supp. at 954.

Beginning on March 28, 1980, Adams and four corporations in which he had a substantial ownership interest[2] sought Board approval of their proposed acquisition of Montana Systems, a bank holding company in Great Falls, Montana, consisting of fifteen subsidiary banks and ten non-bank subsidiaries. Adams initially proposed to purchase 19.5% of Montana Systems voting stock for a price of $4.7 million, with $4 million to be financed through debt, primarily loans from American National. On July 31, 1980, Adams proposed to increase his holdings to 44% and to finance the additional 24.5% acquisition entirely through American National loans. The Board was concerned that the amount of debt financing Adams proposed would prejudice Montana Systems' financial stability. Adams therefore offered to limit his acquisition to an aggregate of 27.98% of the outstanding voting stock (205,043 shares), at a total price of approximately $7 million, of which nearly $5.5 million was to be financed through debt, mainly American National loans. Adams also signed a commitment that he, his family, and any entity in which they held a 10% interest would not directly or indirectly acquire 5% or more of Montana Systems voting stock in any 12-month period without first obtaining Board approval. On October 15, 1980, the Board issued a decision that it would not disapprove Adams' proposed 27.98% acquisition, relying specifically on Adams' commitment.

Following the Board's decision, in January and February 1981, Adams executed a series of contracts to purchase an additional 58,331 Montana Systems shares from the James J. Brown family over a ten-year period, and 50,928 shares from Joanne Rubie over a five-year period. Under these contracts, Adams received the right to vote all of the shares immediately, and he was required to pay interest on the price of the shares he had not yet acquired.

Three business and personal associates of Adams, including Burke and Gates, also purchased Montana Systems stock through American National loans. Adams received voting proxies for all of these shares. Some of the loans were guaranteed by Adams, who pledged financial assets to secure them. At American National's request, an agreement was also entered which allowed Adams to "call" the shares held by his associates, and allowed them to "put" their shares to Adams. Adams was therefore a potential obligor on his associates' loan debts, and American National considered the various loans to Adams and his associates interrelated credits.

In June 1981, the Board conducted its routine annual examination of Montana Systems. The Board found a Montana Systems proxy statement, dated May 8, 1981, indicating that from October 1980 through April 1981, Adams, his affiliate corporations, and his associates—including Burke and Gates—had either purchased or entered into agreements to purchase a total of 329,574 Montana Systems shares, approximately 44% of the voting stock then outstanding. The Board also discovered Adams' contracts to purchase the Brown and Rubie stock.

In April 1982, the Office of the Comptroller of Currency conducted its regularly scheduled examination of American National. The Comptroller determined that some of American National's loans to Adams and his affiliate corporations should be classified as substandard credit risks. The Comptroller also found that Adams had pledged assets to secure American National loans to his associates and discovered the "put" and "call" agreements between Adams and his associates. In late May or

---

**2.** The notice of intent listed Associated Bankers Corporation; Burke Beverage Company, Inc.; First National Incorporated of Springfield, Colorado; and Waite and Company, Inc. of Bozeman.

early June, the Comptroller notified the Board of its findings and at the Board's request the Comptroller forwarded its work papers and related documents. The Board's review of this information, transferred without notice to Adams, Burke or Gates, is the first examination challenged in this action.

In June 1982, the Board again conducted its annual inspection of Montana Systems, reviewing SEC documents and other Montana Systems records. On the basis of this review, its 1981 examination, and the information transferred from the Comptroller, the Board concluded that Adams had violated his commitment not to acquire 5% or more of Montana Systems stock in any 12–month period. On August 12, 1982, Board and Comptroller examiners reviewed and copied portions of American National's files dealing with its loans to Adams, Burke and Gates for purchases of Montana Systems stock. The purpose of this examination was for the Board to confirm the information it had obtained from the Comptroller before drafting a notice of charges against Adams. This review, again without notice to Adams, Burke or Gates, is the second examination challenged here.

Adams and the Board attempted to negotiate a settlement of the matter over the next several months. When negotiations fell through, the Board brought a formal administrative enforcement proceeding against Adams on June 22, 1983, seeking a cease and desist order and a civil money penalty. On August 3, 1983, while the enforcement action was pending, Board examiners again reviewed Adams, Burke and Gates' American National loan files without notifying them. The purpose of this examination was to verify again the accuracy of the Board's information, and to take account of any changes in Adams' position over the past year. The Board also sought new copies of some of the loan documents for use in the administrative proceeding, although no documents ultimately were copied. This is the third and final examination challenged in this action.

The enforcement proceeding was referred to an administrative law judge (ALJ), who issued a recommended decision on May 18, 1984. The ALJ found a technical violation of Adams' commitment to the Board arising from the contracts for the Brown and Rubie stock. The ALJ found that for the months of April through September 1981, and March 1982, Adams' obligation under these contracts to pay interest on the shares he had not yet purchased violated his commitment not to acquire 5% or more of Montana Systems stock in any 12–month period. The ALJ found, however, that the violation was not willful and that it had no financial effect because the Brown and Rubie contracts could have been redrafted to comply with Adams' commitment without changing his financial obligations. The ALJ recommended that the action be terminated without imposition of a civil money penalty or a cease and desist order. On April 23, 1985, the Board in its final decision adopted the ALJ's conclusion that a civil money penalty was not warranted, but ordered Adams to cease and desist from further violations of the Change in Control Act.

On November 16, 1983, Adams, Burke and Gates filed this action, alleging that the Board had violated the Right to Financial Privacy Act by reviewing their American National loan records without notifying them on the three occasions described above. The parties filed cross-motions for summary judgment, the Board arguing that its examinations were exempt from the Act. In a memorandum and order filed May 14, 1987, the district court ruled that the Board did not comply with the Act in reviewing the records. *Adams*, 659 F.Supp. at 955. It held, however, that the Board was exempt under 12 U.S.C. § 3413(b) as a supervisory agency exercising its supervisory and regulatory functions over Montana Systems and American National, *id.* at 955–57, and under 12 U.S.C. § 3413(d) because American National was required to report the information and records under the Change in Control Act, *id.* at 957–58. The only question on appeal is whether the district court erred as a matter of law in ruling that these exceptions apply to the Board's examinations of

Adams, Burke and Gates' American National loan files.

### I.

Adams, Burke and Gates first argue that the district court erred in ruling that the Board's examinations were exempt from the Act as exercises of supervisory authority over American National and Montana Systems. They argue that the Board is not the primary supervisory agency with respect to American National and that it was not exercising a supervisory function over American National or Montana Systems when it reviewed the loan files, but was investigating Adams personally under the Change in Control Act; that such personal investigations do not fall within the scope of section 3413(b); that Burke and Gates had no connection with Adams' acquisition of control over Montana Systems, and therefore the Board had no supervisory authority over them under the Change in Control Act; and that the district court's ruling improperly allows the Board to examine the financial records of any shareholder in a publicly-held bank holding company without complying with the Financial Privacy Act. The Board maintains that the district court did not err in its ruling, and that the initial transfer of information from the Comptroller to the Board was also exempt as an exchange of information between supervisory agencies under 12 U.S.C. § 3412(d). As these are solely questions of law, we review the district court's ruling *de novo.*

The Right to Financial Privacy Act provides that, subject to specified exceptions, "no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution" unless certain procedural requirements, set forth in sections 3404 through 3408, are satisfied. 12 U.S.C. § 3401. Among the exceptions is that provided in section 3413(b), which states: "Nothing in this chapter prohibits examination by or disclosure to any supervisory agency of financial records or information in the exercise of its supervisory, regulatory, or monetary functions with respect to a financial institution." In addition, section 3412(d) provides that "[n]othing in this chapter prohibits any supervisory agency from exchanging examination reports or other information with another supervisory agency." Supervisory agency is defined, in section 3401(6), to include the Board and the Comptroller to the extent that they have statutory authority to examine the financial condition or business operations of a particular financial institution. The questions before us, therefore, are whether the Board and the Comptroller had statutory authority to examine American National or Montana Systems when they exchanged the American National loan files of Adams, Burke and Gates, and whether the Board was exercising such authority when it later examined these files directly.

### A.

We first consider the Board's direct review of the loan files on August 12, 1982, and on August 3, 1983, as the Comptroller's earlier transfer of information to the Board introduces additional complications.

■ Under the Bank Holding Company Act, 12 U.S.C. §§ 1841–1849 (1982), the Board has general authority to supervise and regulate the financial condition and business operations of bank holding companies such as Montana Systems, *e.g.,* 12 U.S.C. § 1844(b), (e), and it may examine such companies and their subsidiaries under 12 U.S.C. § 1844(c). In addition, the Change in Control Act gives the Board specific authority to approve or disapprove acquisitions of control of bank holding companies proposed by any person, "acting directly or indirectly or through or in concert with one or more other persons * * *." 12 U.S.C. § 1817(j)(1). The Board may disapprove such acquisitions if "the financial condition of any acquiring person is such as might jeopardize the financial stability of the bank or prejudice the interests of the depositors of the bank." 12 U.S.C. § 1817(j)(7)(C).[3] With these powers, there

---

**3.** The term "bank" in section 1817(j)(7)(C) includes bank holding companies such as Mon-

is no question that the Board is a supervisory agency with respect to Montana Systems under section 3401(6), and that it has particular authority to supervise Adams' acquisition of control and to review his financial condition insofar as it may affect the company's financial stability.

■ We are also satisfied that the Board was "exercising" this authority within the meaning of section 3413(b) when it reviewed the American National loan files of Adams, Burke and Gates relating to their purchases of Montana Systems stock. The record makes clear that the Board's ultimate concern with regard to Adams' acquisition was to ensure the safety and soundness of Montana Systems and its subsidiary banks, and that the Board was particularly concerned with the level of Adams' debt financing. The Board's notice of charges alleged that if Adams acquired control of a majority of Montana Systems' voting stock and the election of a majority of its directors, he would be capable of diverting funds from the company or its subsidiary banks by increasing dividend payments and management fees, authorizing unwarranted loans, or other means to meet his debt service requirements. Appendix at 41–43. The Board further alleged that such action could prejudice the company, its other shareholders, its subsidiary banks, and their depositors. *Id.* The record also demonstrates that the purpose of the Board's examinations of the American National loan files was to monitor and verify Adams' compliance with his commitment to the Board, which was an express condition of the Board's decision to approve his acquisition and was explicitly designed to limit his debt service requirements. These concerns are well within the scope of the Board's supervisory authority with respect to Montana Systems under the Bank Holding Company Act, *e.g.*, 12 U.S.C. § 1844(e), and the Change in Control Act, *e.g.*, 12 U.S.C. § 1817(j)(7)(C). Accordingly, we reject Adams' argument that the Board was not exercising supervisory authority over Montana Systems when it examined the loan files, and his argument that the Board's "personal" investigation of his compliance with his commitment falls outside the scope of section 3413(b).[4]

■ We also reject Burke and Gates' argument that their loan records had no connection to Adams' acquisition of control over Montana Systems. American National's loans to Burke and Gates were relevant to the level of Adams' total acquisition debt, because Adams guaranteed portions of these loans by pledging some of his own financial assets. In addition, the "put" and "call" agreements between Adams and his associates, which were also contained in American National's loan files, were relevant to determining whether Adams had directly or indirectly acquired the shares originally purchased by his associates, and thereby violated his commitment not to acquire 5% or more of Montana Systems' stock in any 12–month period. As American National recognized, the various loans to Adams and his associates were closely related credits. Thus, the Board's examination of Burke and Gates' loan files was within the scope of its supervisory authority with respect to Montana Systems.

■ Adams, Burke and Gates further argue that neither the Bank Holding Company Act nor the Change in Control Act gave the Board specific authority to request or examine American National's loan files after the Board had issued its decision not to disapprove Adams' proposed acquisition.[5] The record demonstrates that the Board

tana Systems which control FDIC-insured banks.

4. As the district court stated, in quoting the magistrate: "'It would be incongruous to assume Congress would specifically formulate and pass a supervisory agency exception which specifically allows access to customer financial records and then define supervisory agency in such a way that obtaining access to individual customer records is barred.'" *Adams,* 659

F.Supp. at 957. This is particularly true with respect to the Board's supervisory authority under the Change in Control Act, as that Act is directed specifically to acquisitions of control by individuals. *See* 12 U.S.C. § 1817(j)(8)(A).

5. The Change in Control Act was amended in 1986 to provide the Board with such authority. *See* 12 U.S.C.A. § 1817(j)(15)(A) (West Supp. 1988).

reviewed the files under the general provisions of the Federal Reserve Act, *e.g.*, Appendix at 20, which authorize the Board "[t]o examine at its discretion the accounts, books, and affairs * * * of each member bank." 12 U.S.C. § 248(a)(1) (1982). American National is a member bank of the Federal reserve system under 12 U.S.C. § 221 (1982), and is therefore subject to such discretionary examinations. We are satisfied that the Board was entitled to proceed under this general provision in order to exercise its specific authority to supervise Adams' acquisition of Montana Systems. *Cf. CAB v. United States*, 542 F.2d 394, 401–402 (7th Cir.1976) (Civil Aeronautics Board may use general inspection authority to examine air carrier records reasonably relevant to investigation of a subject properly within its jurisdiction). Without such authority, the Board would be powerless to monitor and ensure compliance with orders directed to the future conduct of acquiring parties.[6]

■ Finally, Adams, Burke and Gates argue that the Board should have used its subpoena power to review the loan files, particularly the documents it examined on August 3, 1983, and planned to rely on in the administrative proceeding. In connection with investigations and cease and desist proceedings, the Board may issue subpoenas for the production of documents from any place subject to the United States' jurisdiction. *See* 12 U.S.C. §§ 1818(n), 1820(e) (1982). Certainly the Board could have invoked this power had it encountered difficulties in obtaining access to the documents, or sought records which were not in the possession of a member bank. However, Adams, Burke and Gates have not cited, nor have we located, any authority requiring the Board to resort to compulsory process in the present circumstances. The Board's discretionary authority to examine the records of member banks under 12 U.S.C. § 248(a)(1) is not

limited by any requirement that the Board first obtain or issue a subpoena for such documents, nor is its application confined to any particular form of supervisory action. American National consented to the Board's examinations of its loan files relating to purchases of Montana Systems' stock. Accordingly, we conclude that the Board was not required to issue a subpoena before requesting access to these documents.

It should be evident that our decision is based on the Board's supervisory authority over changes in control of bank holding companies, and the particular relationship between Adams' acquisition and the purchases of Montana Systems stock by Burke and Gates.

We conclude that on August 12, 1982, and August 3, 1983, the Board examined the American National loan files of Adams, Burke and Gates relating to their purchases of Montana Systems stock as a supervisory agency exercising its supervisory functions with respect to Montana Systems, and that the Board was therefore exempt from the requirements of the Financial Privacy Act under 12 U.S.C. § 3413(b).

### B.

■ Next, we consider the Comptroller's transfer of its examination report and other information to the Board in May or June 1982. Under 12 U.S.C. § 481 (1982), the Comptroller has statutory authority to examine the *financial condition* of national banks such as American National, and there is no dispute that the Comptroller's examiners were exercising this authority when they inspected the loan files of Adams, Burke and Gates as part of their routine annual examination of American National in April 1982. The Comptroller was therefore exempt from the Financial Privacy Act in conducting this examination

---

**6.** In reaching this conclusion, we need not decide whether the Board was also exercising supervisory authority over American National in reviewing the loan files. Neither section 248(a)(1) nor section 3413(b) requires that the financial institution from which documents are obtained be the same as that which the Board is supervising at the time, and the factual circumstances of this case demonstrate why such a requirement should not be read into these provisions.

under 12 U.S.C. § 3413(b). The parties dispute, however, whether the Comptroller had authority to transfer the information it obtained to the Board without notifying Adams, Burke or Gates.

Adams, Burke and Gates argue that a government agency may not transfer financial records obtained pursuant to the Financial Privacy Act to another agency or department unless it certifies that there is reason to believe the records are relevant to a legitimate law enforcement inquiry and provides notice to the customer that the records have been transferred. *See* 12 U.S.C. § 3412(a), (b). They also claim that records received through such a transfer may only be used for the purpose for which they were originally obtained, unless the requirements of the Financial Privacy Act are satisfied. *See* 12 U.S.C. § 3413(h)(4), (5). On the basis of these provisions, Adams, Burke and Gates argue that the Board violated the Financial Privacy Act when it obtained the Comptroller's examination report.

The certification and notice requirements of section 3412(a) and (b) apply generally to all government agencies and departments, and are not addressed specifically to banking agencies. The same is true of the provisions of section 3413(h). Section 3412(d), however, allows the exchange of examination reports and other information between bank supervisory agencies, as defined in section 3401(6), notwithstanding limitations set forth elsewhere in the Financial Privacy Act. The Comptroller's authority to examine national banks under section 481 demonstrates that it is a supervisory agency with respect to American National, and the Federal Reserve Act makes clear that the Board is such an agency, as well. Under this Act, member banks such as American National are "subject to examinations made by direction of the Board," 12 U.S.C. § 325 (1982), including special examinations arranged by the local Federal reserve bank with the approval of the Board or a Federal reserve agent, 12 U.S.C. § 483 (1982). We have emphasized that the Board has specific authority "[t]o examine at its discretion the accounts, books, and affairs * * * of each member bank." 12 U.S.C. § 248(a)(1). Under these provisions, the Board "has statutory authority to examine the financial condition or business operations" of American National, and is therefore a supervisory agency with respect to American National under 12 U.S.C. § 3401(6).[7]

Adams, Burke and Gates argue, however, that the Board was also required to review the information obtained from the Comptroller in the *exercise* of its supervisory authority over American National. They argue that the Board had already begun to investigate Adams' compliance with his commitment when the Comptroller transferred the information, and that the Board had requested the information to aid in its investigation, rather than to review the financial condition of American National.

We reject this argument. Section 3412(d) requires only that an agency examining transferred customer records have supervisory authority with respect to the financial institution from which the records were originally obtained. The Board plainly meets this condition with respect to American National. Moreover, our analysis of the Board's later examinations makes clear that the Board could have obtained this information directly from American National in the exercise of its supervisory authority with respect to Montana Systems, and that in doing so the Board would have been exempt from the requirements of the Financial Privacy Act as a supervisory agency under 12 U.S.C. § 3413(b). *See supra* Part IA. We are satisfied that the provision of section 3412(d) allowing exchange of examination reports and other information between supervisory agencies

---

**7.** In allowing exchanges of information between supervisory agencies, section 3412(d) contemplates that more than one agency may have supervisory authority over a particular financial institution, and both the Board and the Comptroller satisfy the requirements of section 3401(6). Accordingly, it is not material that the Comptroller rather than the Board is the "primary" supervisor and regulator of national banks such as American National, as Adams, Burke and Gates emphasize.

should apply to such situations. It would be incongruous to hold that supervisory agencies are exempt from the Financial Privacy Act when, in the exercise of their various supervisory functions, they independently obtain customer records from a financial institution, but that such agencies must comply with the Act when, in the exercise of the same functions, they exchange such records.

We conclude that the Comptroller's report to the Board was an exchange of information between supervisory agencies and that the exchange was exempt from the requirements of the Financial Privacy Act under 12 U.S.C. § 3412(d).

## II.

As we affirm the judgment entered by the district court on the basis of the exceptions to the Financial Privacy Act in 12 U.S.C. §§ 3412(d) and 3413(b), it is unnecessary to consider whether the exemption provided in 12 U.S.C. § 3413(d) for information required to be reported also applies to the Board's examination of the American National loan files. We have considered the remaining arguments offered by Adams, Burke and Gates with respect to the Financial Privacy Act and the other statutory provisions upon which we rely, and we have determined that these arguments are without merit. In particular, Adams, Burke and Gates' reliance on *Hunt v. SEC*, 520 F.Supp. 580 (N.D.Tex.1981), is misplaced, as that decision involved activities of the SEC and did not consider any of the exemptions for bank supervisory agencies provided in the Financial Privacy Act.

The judgment entered by the district court is affirmed.